UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      -v.-                                                                24 Cr. 200 (ER)

RAFAEL RIVERA,

           Defendant.


**MEMORANDUM OF LAW IN SUPPORT OF
<u>RAFAEL RIVERA'S PRETRIAL MOTIONS</u>**


Ezra Spilke
1825 Foster Avenue
Suite 1K
Brooklyn, NY 11230

Submitted: November 5, 2024                     *Counsel for Rafael Rivera*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. ii

**PRELIMINARY STATEMENT** ......................................................................................... 1

**FACTUAL BACKGROUND** .............................................................................................. 1

**DISCUSSION** ....................................................................................................................... 4

      I.    The Evidence Obtained from Rivera's Person and Vehicle and from the Ensuing Investigation Should Be Suppressed as the Fruits of an Unlawful Seizure ................................. 4

      II.   The Search of Rivera's Vehicle Pursuant to His Arrest Was Unlawful ................. 7

      III.  Count Three Is Unconstitutional Under the Second Amendment on Its Face and as Applied to Rivera and Should Be Dismissed ....................................................................... 8

          A.   Governing Standards ........................................................................................... 8

          B.   Argument ........................................................................................................... 10

**CONCLUSION** .................................................................................................................. 18

# TABLE OF AUTHORITIES

<u>Cases</u>

*Arizona v. Gant*, 556 U.S. 332 (2009) ...................................................................... 7, 8

*Chimel v. California*, 395 U.S. 752 (1969) ................................................................. 7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................. 9, 11

*Dunaway v. New York*, 442 U.S. 200 (1979) ............................................................. 6

*Folajtar v. Attorney General of the United States*, 980 F.3d 897 (3d Cir. 2020) ........................ 13

*Golino v. City of New Haven*, 950 F.2d 864 (2d Cir. 1991) .......................................... 5

*Jones v. United States*, 357 U.S. 493 (1958) .............................................................. 7

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ........................................................... 13

*Katz v. United States*, 389 U.S. 347 (1967) ............................................................... 7

*Martinez v. Simonetti*, 202 F.3d 625 (2d Cir. 2000) ................................................... 5

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................................... 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ...................... 9, 10, 12, 13

*Nunn v. State*, 1 Ga. 243 (1846) ............................................................................. 9

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) ...................... 11, 12, 14, 15

*United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss., June 28, 2023) .................................................................................................. 12

*United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) ............................................. 15

*United States v. Carrero*, No. 2:22-cr-30, 2022 WL 9348792 (D. Utah Oct. 14, 2022) .............. 12

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) .............................................. 12

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) .............................................. 15

*United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) .......................................... 15, 16

*United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024)................................................................ 16

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2024) ..................................................................... 16

*United States v. Harper*, No. 21-cr-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023) ............ 12

*United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024) .......................................................... 15

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)........................................................... 13

*United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016).................................................... 6

*United States v. Quailes*, No. 21-cr-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023)........... 12

*United States v. Quiroz*, 629 F. Supp. 3d 511 (W.D. Tex. Sept. 19, 2022) .................................. 13

*United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024)........... 9, 16, 17

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010).................................................................. 13

*United States v. Valentine*, 539 F.3d 88 (2d Cir.2008) ................................................................. 6

*United States v. Wyche*, 307 F. Supp. 2d 453 (E.D.N.Y. 2004) ................................................... 5

*Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023).................................................................... 16

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................................................................... 5, 6

<u>Other Authorities</u>

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and
    Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009).................................................................... 12

Fed. R. Crim. P. 12(b)(3)(C)............................................................................................................ 5

Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv.J.L. & Pub. Pol'y 695 (2009)
    ....................................................................................................................................................... 14

U.S. Const. amend. II....................................................................................................................... 9

U.S. Const. amend. IV ..................................................................................................................... 4

## PRELIMINARY STATEMENT

Rafael Rivera is charged in a three-count indictment with distribution of narcotics, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C); the use, carrying, and possession of a firearm, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8).

This case concerns Rivera's arrest and the subsequent search and seizure of his vehicle, a red, 2001 Honda Civic pursuant to that arrest. The arrest was based on the alleged observations of a law enforcement officer posted on a rooftop six stories above street level and at night. Despite these conditions, the officer claimed he observed Rivera accept "U.S. currency" from an alleged drug purchaser. In exchange, the officer claimed to observe, Rivera handed the alleged purchaser "items." These vague and implausible observations led to Rivera's arrest and a search of his vehicle. The arrest was unlawful and the fruits of the ensuing search and investigation should be suppressed.

In addition, Count Three charges a violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) imposes permanent disarmament without an individual judicial determination that the defendant poses a credible threat to the physical safety of others. The statute thus violates the Second Amendment both on its face and as applied to Rivera.

## FACTUAL BACKGROUND

At approximately 7:45 P.M. on January 23, 2024, Rivera was standing outside of his car, a red, 2001, two-door, Honda Civic, on the sidewalk when two officers from the New York City Police Department approached him. According to Rivera, at the time of his arrest, his car was parked on Davidson Avenue outside of 27 Buchanan Place. (Rivera Decl. at ¶ 7). Before his arrest, he recently exited the car and the driver's side door was opened. (Rivera Decl. at ¶ 8; Ex.

B at 00:43:49).[1] There was a backpack in the front passenger seat which was zipped shut. (Rivera Decl. at ¶ 8). All other compartments in the car, including the glove compartment, were closed. (*Id.*)

At approximately 7:45 PM, police officers pulled up next to the parked car, exited and approached Rivera. (Ex. B at 00:44:41). While the officers questioned Rivera, Officer Arroyo began to enter the open driver's side door of Rivera's car. (Ex. C at 19:45:14). When he saw Arroyo entering his car, Rivera stated: "Why are you touching me so much though like that? Bro, I'm not even giving you permission to be in the car." (Ex. C at 19:45:37). Officer Arroyo stated twice: "I don't need your permission." (Ex. C at 19:45:42-19:45:46).

Officer Arroyo continued his attempt to search the car by walking around to the passenger side door and attempting to open it. It was locked, prompting Arroyo to demand Rivera's keys from him. (Ex. C at 19:46:11). Rivera initially declined but complied after officers began handcuffing him. (Rivera Decl. at ¶ 11). He did not feel that he was able to refuse. (*Id.*) Even though Rivera allowed the police take his keys, the police still handcuffed him. (*Id.*).

With Rivera in handcuffs, Arroyo took Rivera's keys and unlocked the passenger-side door. Arroyo began to search the car from the passenger side. (Rivera Decl. at ¶ 12). There was a backpack in the front passenger seat which was zipped shut. (Rivera Decl. at ¶ 8). In the body-worn camera footage, Arroyo can be heard rummaging around the car, including a plastic shopping bag, (Ex. C at 19:48:13), and seen opening and searching a closed backpack. (Ex. C at 19:48:30). Next, he opened and searched the closed glove compartment. (Ex. C at 19:49:50).

---

[1] The citations to Exhibit B are to the time elapsed in the video. As to Exhibit C, the times cited are the time of day superimposed on the video image.

Finally, Arroyo searched the back seat where he reported that he found firearms, which he reported over the radio. (Ex. C at 19:50:24).

From the moment Arroyo took Rivera's keys, Rivera was handcuffed and surrounded by multiple police officers. (*See* Rivera Decl. at ¶ 12). Rivera never gave the police permission to search his car, and indeed explicitly informed the officers that they did not have permission. (Rivera Decl. at ¶ 13).

In a sworn complaint filed in this case, Task Force Officer Walter Mikowski alleged that at approximately 7:10 p.m. on January 23, 2024, two law enforcement officers reportedly conducted rooftop surveillance near 183rd Street and Davidson Avenue. They were reportedly using binoculars. One officer reported that this vantage point offered a clear, wide view of the area. (Compl. at ¶ 6.b).

The officer claimed that around 7:40 p.m., he observed what appeared to be a hand-to-hand drug transaction near Davidson Avenue and Buchanan Place. (Compl. at ¶ 6.c). According to the officer, Rivera was approached by another man, "Individual-1," who handed Rivera what the officer believed to be cash. The officer alleged that Rivera then entered the driver's seat of a red vehicle, leaned toward the passenger side, and rummaged through a bag. The officer further alleged that Rivera handed items to Individual-1, who examined them briefly before walking away. This interaction reportedly lasted under a minute

The officer then announced over the radio that he had observed a drug transaction and instructed the other officer, whom I believe, from my review of the Rule 16 discovery to be Officer Arroyo, to arrest Rivera, whom he indicated was near the vehicle on Davidson Avenue and Buchanan Place. (Compl. at ¶ 6.d). According to the complaint, Arroyo directed officers to arrest Rivera, who was handcuffed near the vehicle. (Compl. at ¶ 6.e).

- 3 -

Arroyo reported that he had observed a firearm in the vehicle and informed the rooftop officer. (Compl. at ¶ 6.f). The rooftop officer then approached the vehicle and claimed to have found two firearms in the back pocket of the front passenger seat. (*Id.*) He described one as a black 9mm Taurus semi-automatic pistol loaded with 11 rounds and bearing a serial number and the other as a blue-teal Derringer Cobra pistol loaded with two rounds and bearing a defaced serial number. (*Id.*)

Law enforcement officers transported Rivera to the 52nd Precinct, where they reportedly recovered approximately $74 in cash from his person. (Compl. at ¶ 6.g). During arrest processing, officers alleged that they noticed an object concealed in Rivera's groin area. They reported recovering approximately 31 glassines of suspected heroin, some marked with a green check, as well as 12 bags of suspected cocaine and 13 vials of suspected crack cocaine (Compl. at ¶ 6.h).

During processing, Rivera reportedly remarked that with "two gun charges, crack, dope, and coke," he was "not getting released." (Compl. at ¶ 6.i). Officers further claimed that while at the precinct, they recovered approximately six additional glassines of suspected heroin, similarly marked with a green check, from a tin inside Rivera's vehicle. (Compl. at ¶ 6.j). Motor vehicle records showed that the red vehicle was registered to Rafael G. Rivera (Compl. at ¶ 6.k).

## DISCUSSION

### I.    The Evidence Obtained from Rivera's Person and Vehicle and from the Ensuing Investigation Should Be Suppressed as the Fruits of an Unlawful Seizure

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City*

*of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) "Lawful arrest, i.e., arrest pursuant to probable cause, requires the arresting officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (cleaned up) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1995)).

"On a motion to suppress evidence in a criminal trial, once [a defendant] establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004). If evidence is obtained as the result of an illegal search or seizure, it cannot be introduced as evidence of the defendant's guilt. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Motions to suppress are brought under Rule 12 of the Federal Rules of Criminal Procedure. Fed. R. Crim. P. 12(b)(3)(C).

According to officer statements in the complaint, Rivera was stopped and arrested on the basis of one officer's observation of what he believed to be a hand-to-hand drug sale. That officer was on the rooftop, at night, several stories above street level. Despite the distance and the darkness, the officer claimed that he could observe the following:

> Officer-1 observed a male individual ("Individual-1") approach RIVERA and hand RIVERA what appeared to be U.S. currency. RIVERA then entered the front driver's side door of a red vehicle (the "Vehicle"), leaned over towards the passenger's side of the Vehicle, and sorted through what appeared to be a bag. Individual-1 approached the front driver's side door of the Vehicle and RIVERA handed items to Individual-1, who observed the items briefly before walking away.

(Compl. at ¶ 6.c).

But the officer's recitation of his observations should not be credited. The street was

dark, and the officer by his own admission was six stories above street level.[2] That the officer observed the individual hand Rivera anything under such conditions is implausible. It defies all reason that he saw "U.S. Currency," rather than a note or a piece of paper, from six stories at night. On the other side of the purported transaction, the officer reported that he saw Rivera hand the individual "items." The officer's description was far too vague and improbable to provide a basis for probable cause. *See United States v. McDow*, 206 F. Supp. 3d 829, 842-43 (S.D.N.Y. 2016) (Gardephe, J.) (officer who testified at a suppression hearing that he observed only a brief meeting between the defendant and an alleged drug purchaser was not credible and his testimony was too vague where it conflicted with previous state grand jury testimony that he observed the defendant and the alleged purchaser "exchanging U.S. currency for objects."). Notably, the alleged drug buyer was not apprehended even though the police purportedly believed the buyer to possess relevant evidence against Rivera.

Law enforcement lacked "'sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.'" *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir.2008) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990)). Therefore, the evidence obtained as a result of the illegal arrest – including Rivera's statements and his cellphone as well as the fruits of the further investigation that ensued – should be suppressed. *See Dunaway v. New York*, 442 U.S. 200, 218 (1979); *Wong Sun*, 371 U.S. at 487-88.

_____

[2] The government has not yet identified the exact location of the officer when he purportedly observed the alleged transaction, but all of the buildings on Davidson between Buchanan Place and West 183 Street other than 27 Buchanan Place are six-story walkups. 27 Buchanan Place has seven stories.

## II.    The Search of Rivera's Vehicle Pursuant to His Arrest Was Unlawful

The Supreme Court has made clear that warrantless searches are "per se unreasonable," and presumptively unconstitutional. *Katz v. United States*, 389 U.S. 347, 357 (1967). There are a few "jealously and carefully drawn" exceptions to that rule, *Jones v. United States*, 357 U.S. 493, 499 (1958), including the one at issue here, a search incident to arrest.

That exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). In *Chimel v. California*, 395 U.S. 752 (1969), the Supreme Court defined the boundaries of this exception, holding that a search incident to arrest may include only "the arrestee's person and the area 'within his immediate control'--construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763. Those boundaries ensure that "the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Gant*, 556 U.S. at 339 (explaining *Chimel*).

In *Gant*, the Supreme Court clarified and circumscribed the scope of warrantless searches incident to arrest. 556 U.S. 332. Some lower courts had held that officers could search a car anytime they arrested an occupant. *Id.* at 342. The *Gant* Court firmly rejected that rule. Warrantless searches, the Court explained, are reasonable only if connected to "the justifications underlying" the relevant exception to the warrant requirement. *Id.* at 343. But allowing "a vehicle search incident to every recent occupant's arrest would . . . untether the rule from the justifications underlying the *Chimel* exception." *Id.* Thus, the Court reiterated "that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.*

The Court further concluded that "[a]lthough it does not follow from *Chimel*, we also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). But the Court cautioned that "[i]n many cases," including in *Gant* itself where the suspect was arrested for driving with a suspended license, "there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id.*

Here, Rivera was placed in handcuffs before Officer Arroyo began searching the interior of the vehicle. He was thus "[]secured and [not] within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 343. Accordingly, the *Chimel* justifications – i.e., "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy," *id.* at 339 – were not implicated here.

Additionally, the officers lacked a reasonable belief that "evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 343. The officer on the rooftop stated that he observed the alleged drug purchaser hand Rivera "what appeared to be U.S. currency" and Rivera hand the alleged purchaser "items" after sorting through a bag. (Compl. at ¶ 6.c). But for the reasons set forth in the previous section, those observations were completely implausible and, in the instance of the observation of "items," vague. The officer was six stories above street-level, it was nighttime, and the police did not detain the alleged purchaser. The search was unlawful and its fruits should be suppressed.

## III. Count Three Is Unconstitutional Under the Second Amendment on Its Face and as Applied to Rivera and Should Be Dismissed

### A. <u>Governing Standards</u>

Rivera also challenges the constitutionality – both on its face and as applied to him – of

18 U.S.C. § 922(g)(1). A challenge to the constitutionality of a statute underlying a criminal charge is properly brought in a pretrial motion to dismiss. *See, e.g.*, *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889, 1896 219 L. Ed. 2d 351 (2024).

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008) the Supreme Court interpreted "the people" to encompass "all Americans," noting that as used in the Constitution, "the people" is "a term of art" that "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580–81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)); *see also Nunn v. State*, 1 Ga. 243, 251 (1846) (quoted approvingly in *Heller*, 554 U.S. at 612). Just as individuals who have served criminal sentences are part of "the people" referred to in the First and Fourth Amendments, so too must they be part of "the people" referred to in the Second. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality) (warning that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees").

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court reaffirmed its holding in *Heller* and clarified that the only way that laws can restrict the exercise of that right is if they are shown to be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

*Bruen* summarized the standard for assessing challenges to firearms regulations under the Second Amendment as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the

individual's conduct falls outside the Second Amendment's unqualified
command.

*Id.* (internal quotation marks omitted).

For the government to meet its burden to show that a challenged regulation meets the
historical tradition test, it is required to look at whether "'historical precedent' from before,
during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 26-27.
"[W]hen it comes to interpreting the Constitution," however, "not all history is created equal,"
and "Constitutional rights are enshrined with the scope they were understood to have when the
people adopted them." *Id.* at 34 (internal quotation marks omitted). Thus, post-ratification history
can clarify the meaning of indeterminate phrases in the Constitution, but "post-ratification
adoption or acceptance of laws that are inconsistent with the original meaning of the
constitutional text obviously cannot overcome or alter that text." *Id.* at 36 (internal quotation
marks omitted).

In some cases, the *Bruen* Court elaborated, the application of the historical tradition test
is "fairly straightforward," in that "when a challenged regulation addresses a general societal
problem that has persisted since the 18th century, the lack of a distinctly similar historical
regulation addressing that problem is relevant evidence that the challenged regulation is
inconsistent with the Second Amendment." *Id.* at 26.

B.  Argument

The first *Bruen* step is determining whether the conduct falls within Second
Amendment's scope. In this effort, courts must evaluate the "conduct" being regulated, not the
status of the person performing the conduct. *Bruen*, 597 U.S. at 18. Here, the conduct the
government seeks to punish is Rivera's knowing possession of firearms and ammunition, which
is presumptively protected by the Second Amendment. *Id.* The Second Amendment protects the

right of "the people" to "keep and bear arms." U.S. Const. amend. II. Possession of a firearm, the

conduct proscribed by Section 922(g)(1), qualifies as "keep[ing] and bear[ing]" arms. *See Heller*,

554 U.S. at 628-29; Bruen, 597 U.S. at 32-33. The firearm at issue here indisputably falls under

the "arms" covered by the Amendment's plain text. *Heller*, 554 U.S. at 635.

The *Heller* Court also answered, for the purposes of step one, whether the Second

Amendment covers the so-called "national community," or a subset of the Nation called the

"political community." It chose the broader definition: "'[T]he people' protected by the Fourth

Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are

part of a national community or who have otherwise developed sufficient connection with this

country to be considered part of that community." *Id.* at 580 (cleaned up). "We start therefore

with a strong presumption that the Second Amendment right is exercised individually and

belongs to all Americans." *Id.* at 581.

Relying on this part of *Heller*, the Third Circuit, sitting en banc, concluded that persons

with felony convictions are part of "the people" and presumptively retain Second Amendment

rights. *See Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101 (3d Cir. 2023).[3]

That court explained:

> [T]he phrase "law-abiding, responsible citizens" is as expansive as it is vague.
> Who are "law-abiding" citizens in this context? Does it exclude those who have
> committed summary offenses or petty misdemeanors, which typically result in a
> ticket and a small fine? No. . . . As the Supreme Court noted recently: "a felon is
> not always more dangerous than a misdemeanant." As for the modifier
> "responsible," it serves only to undermine the Government's argument because it

---

[3] This decision reversed an earlier decision by the Third Circuit. *See Range v. Att'y Gen. United States*, 53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023), and *on reh'g en banc sub nom. Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023).

renders the category hopelessly vague. In our Republic of over 330 million
people, Americans have widely divergent ideas about what is required for one to
be considered a "responsible" citizen.

*Id.* at 102 (internal citation omitted) (quoting *Lange v. California*, 594 U.S. 295 (2021)).

Numerous district courts have reached the same conclusion. *See, e.g.*, *United States v. Carrero*,
No. 2:22-cr-30, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022); *United States v. Bullock*, No.
3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *21 (S.D. Miss., June 28, 2023); *United States
v. Harper*, No. 21-cr-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023); *United States v.
Quailes*, No. 21-cr-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023). "[T]he Second
Amendment's plain text covers [Rivera's] conduct," and "the Constitution presumptively
protects that conduct." *Bruen*, 597 U.S. at 19.

After Rivera establishes step one of the *Bruen* test, the government has the burden to
establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm
regulation." *Id.*

The government cannot meet this burden, as no such historical tradition exists. Multiple
jurists and scholars have concluded that § 922(g)(1) is not rooted in the Nation's historical
tradition. One scholar concluded, for example, after examining felon disarmament laws, that "so
far as I can determine, no colonial or state law in eighteenth-century America formally restricted
the ability of felons to own firearms." Carlton F.W. Larson, *Four Exceptions in Search of A
Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374
(2009). And numerous courts have found a similiar absence of Founding Era precedent
supporting a ban on firearms possession for felons. *See e.g.*, *United States v. Chester*, 628 F.3d
673, 679 (4th Cir. 2010) ("Federal felon dispossession laws . . . were not on the books until the
twentieth century, and the historical evidence and scholarly writing on whether felons were
protected by the Second Amendment at the time of its ratification is inconclusive."); *United*

*States v. Quiroz*, 629 F. Supp. 3d 511, 520 (W.D. Tex. Sept. 19, 2022) (dismissing an indictment charging the defendant with receiving a firearm while under felony indictment in violation of 18 U.S.C. § 922(n) after finding that Section 922(n) is unconstitutional on its face in light of Bruen, and observing that "[w]hether this Nation has a history of disarming felons is arguably unclear— it certainly isn't clearly 'longstanding'").

Writing in dissent on the Seventh Circuit, then-Judge Barrett explained that the "best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting); *see also Folajtar v. Attorney General of the United States*, 980 F.3d 897, 914–15 (3d Cir. 2020) (Bibas, J., dissenting) ("Little evidence from the Founding supports a near-blanket ban for all felons. I cannot find, and the majority does not cite, any case or statute from that era that imposed or authorized such bans."); *United States v. Skoien*, 614 F.3d 638, 650 (7th Cir. 2010) (Sykes, J., dissenting) (the "historical evidence" that felons were excluded from the right to bear arms during the Founding Era "is inconclusive at best"); *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring) ("[M]ore recent authorities have *not* found evidence of longstanding [felon] dispossession laws. On the contrary, a number have specifically argued such laws did not exist and have questioned the sources relied upon by the earlier authorities." (emphasis in original)). There is simply no "historical tradition" of regulations that are "distinctly similar" to § 922(g)(1). *Bruen*, 597 U.S. at 26. Rather, "the federal 'felon' disability—barring any person convicted of a crime punishable by more than a year in prison from possessing any firearm—is less than fifty years old" and "dates to a 1961 amendment of the Federal Firearms Act of 1938." Kevin

Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv.J.L. & Pub. Pol'y 695, 698 (2009).

Such regulations boasting a decades-long pedigree may be called "longstanding" in a colloquial

sense, but following Bruen's statement of the requisite analysis, their existence cannot satisfy the

government's burden to prove that the regulations are consistent with "historical tradition of

firearm regulation." *Bruen*, 597 U.S. at 33-34.

Against this backdrop, the en banc Third Circuit, in *Range*, held 18 U.S.C § 922(g)(1)

unconstitutional as applied, finding that the government had "not shown that the Nation's

historical tradition of firearms regulation supports depriving Range of his Second Amendment

right to possess a firearm." *Range*, 69 F.4th at 106. The Third Circuit rejected the purported

historical analogues, including the efforts by legislatures to impose status-based restrictions to

disarm certain groups, finding that apart from the fact that those restrictions based on race and

religion now would be unconstitutional under the First and Fourteenth Amendments, the

Government does not successfully analogize those groups to Range and his individual

circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists,

Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a

similar group today. *Range*, 69 F.4th at 104–05.

The *Range* court was likewise unpersuaded by the government's argument that founding

era felons often faced consequences more severe than disarmament, such as death, even for non-

violent offenses, finding that this historical reality "does not suggest that the particular (and

distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and

tradition" and "does not mean the State, then or now, could constitutionally strip a felon of his

right to possess arms if he was not executed." *Id.* at 105.

The *Range* Court further noted that "founding-era laws often prescribed the forfeiture of

the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally." *Id.* (citing Act of Dec. 21, 1771, ch. 540, N.J. Laws 343–344 ("An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns"); Act of Apr. 20, 1745, ch. 3, N.C. Laws 69–70 ("An Act to prevent killing deer at unseasonable times, and for putting a stop to many abuses committed by white persons, under pretence of hunting")).

Finally, the *Range* Court was not persuaded by the government's citation of appellate decisions that have categorically upheld felon-possession prohibitions, as well as over 80 district court decisions that have addressed § 922(g)(1) and have ruled in favor of the government, as the circuit court opinions were decided before Bruen, and the district courts were bound to follow their circuits' precedent. *Id.* at 106.

Like the Third Circuit, the Ninth Circuit, in *United States v. Duarte*, 108 F.4th 786 (9th Cir. 2024) ("Duarte II"), originally "concluded that there was no analogous tradition of disarmament for at least some defendants." *United States v. Duarte*, 108 F.4th 786, 787 (9th Cir. 2024) ("*Duarte II*"); *see United States v. Duarte*, 101 F.4th 657, 691 (9th Cir. 2024) ("*Duarte I*").[4] The Eighth Circuit concluded otherwise, *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024), while the Fourth, Seventh, Tenth and Eleventh Circuits upheld the continued constitutionality of § 922(g)(1) under pre-*Bruen* precedent without reaching the historical question, *United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024); *United States v. Gay*, 98

_____

[4] Following the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ——, 144 S. Ct. 1889, —— L.Ed.2d —— (2024), the Ninth Circuit, in *Duarte II*, vacated its earlier decision and elected to rehear the case en banc. A decision has not yet issued.

F.4th 843, 847 (7th Cir. 2024), *reh'g denied*, No. 23-2097, 2024 WL 3816648 (7th Cir. Aug. 14, 2024); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir. 2023), *cert. granted, judgment vacated*, 2024 WL 3259668 (July 2, 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024).

Following the Supreme Court's recent decision in *Rahimi*, the Supreme Court remanded all of the § 922(g)(1) cases before it – including *Range*, *Vincent* and *Jackson* – to the circuit courts "for further consideration" in light of its decision in that case.[5] But as Judge VanDyke noted in *Duarte II*, "[n]othing in . . . *Rahimi* . . . controls or even provides much new guidance for these cases." 108 F.4th at 787.

*Rahimi* involved a domestic abuser with a long and well-documented history of violence with a firearm. 144 S. Ct. at 1894–95. During one incident, Rahimi dragged his girlfriend to his car, shoved her head against the dashboard, and fired a gun when she tried to flee. *Id.* Rahimi later "threatened a different woman with a gun, resulting in a charge for aggravated assault with a deadly weapon," and became "the suspect in a spate of at least five additional shootings." *Id.* at 1895. A judge issued Rahimi's girlfriend a restraining order on the basis that he posed "a credible threat to the physical safety of [her] or her family." *Id.* at 1896 (cleaned up). This rendered him ineligible to possess firearms under 18 U.S.C. § 922(g)(8), which, unlike § 922(g)(1)'s permanent bar on possession, "only prohibits firearm possession so long as the defendant 'is'

_____

[5] Briefs filed in *Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024); *Vincent v. Garland*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024); *Jackson v. United States*, No. 23-6170, 2024 WL 3259675 (U.S. July 2, 2024); *Cunningham v. United States*, No. 23-6602, 2024 WL 3259687 (U.S. July 2, 2024); *Doss v. United States*, No. 23-6842, 2024 WL 3259684 (U.S. July 2, 2024).

subject to a restraining order." *Id.* at 1902.

In *Rahimi*, which upheld the constitutionality of § 922(g)(8) in response to a facial challenge, the Supreme Court emphasized that its holding was a narrow one. *See id.* at 1903 ("[W]e conclude only this: . . ."). The Court relied heavily on the distinction between those "who have been found to pose a credible threat to the physical safety of others [and] those who have not," *id.* at 1902, to "conclude only [that] [a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment," *id.* at 1903 (emphasis added).

As Justice Gorsuch explained, the Court did not "decide . . . whether the government may disarm a person without a judicial finding that he poses a 'credible threat' to another's physical safety," "resolve whether the government may disarm an individual permanently," or "approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem . . . 'not responsible.' " *Id.* at 1909–10 (Gorsuch, J., concurring).

These issues – left unanswered by *Rahimi* – are directly implicated in this case, and the factors that the Court relied on to assure itself of § 922(g)(8)'s constitutionality are simply not present here. Section 922(g)(1) does not require a judicial determination that a felon like Rivera would "pose[ ] a clear threat of physical violence to another." *Id.* at 1901. Nor is its disarmament temporary. Section 922(g)(1)'s permanent disarmament of felons is facially overbroad.

Even when a person has been convicted of what may be considered violent felonies, the Second Amendment does not permit the permanent disability that § 922(g)(1) imposes. Rivera, whose felony convictions encompass mostly drug offenses and firearm possession, has been convicted of at least felonies that may be considered "violent." But they do not establish that Rivera poses a credible threat to another's physical safety.

- 17 -

In *Rahimi*, the defendant was under an active order of protection. Thus, a court had determined that Rahimi posed a particular threat. Once the order of protection lapsed, the disability imposed by § 922(g)(8) would lift. The disarmament was thus temporary. At the time of his arrest, no judicial or other determination indicated Rivera posed a threat to anyone. And § 922(g)(1) imposes a permanent ban. Thus, even if this Court determines that § 922(g)(1) is not facially unconstitutional, it is still unconstitutional as applied to Rivera.

## CONCLUSION

For these reasons, the Court should grant Rafael Rivera's motion to suppress and hold an evidentiary hearing. In addition, Count Three should be dismissed as unconstitutional.

Dated:          Brooklyn, New York
                November 5, 2024                    Respectfully submitted,


                                                     /s/ Ezra Spilke
                                                    Ezra Spilke


TO:    Damian Williams, Esq.
       United States Attorney
       Southern District of New York
Attn:  Amanda Weingarten
       Assistant United States Attorneys