UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

– against –

RAFAEL RIVERA,

                Defendant.

**OPINION & ORDER**

24 Cr. 200 (ER)

RAMOS, D.J.:

    Rafael Rivera is charged in a three-count indictment with (1) distributing narcotics; (2) using and carrying a firearm in furtherance of a drug trafficking crime; and (3) possessing a firearm after being convicted of a felony. Doc. 12.

    Before the Court are Rivera's pretrial motions: (1) to suppress the evidence obtained as a result of his arrest and a search of his vehicle; and (2) to dismiss Count Three—charging him with being a felon in possession of a firearm—as unconstitutional. Doc. 24. For the reasons set forth below, the motions are DENIED.

**I. BACKGROUND**

    **A. Factual Background**

    *1. Offense Conduct, Search, and Arrest*

    On the evening of January 23, 2024, New York City Police Department officers were conducting surveillance with binoculars from the rooftop of a building near the intersection of 183rd Street and Davidson Avenue in the Bronx (the "Bronx intersection"). Doc. 1 at ¶ 6(b). The officers were there because the area surrounding the building had been experiencing a rise in shootings and narcotics trafficking since December 2023. *Id.* at ¶ 6(a). According to Deputy Inspector Chase Maneri ("Deputy

Inspector Maneri").[1] who was on the rooftop, the rooftop provided a clear and wide-reaching view of the Bronx intersection. *Id.* at ¶ 6(b).

At approximately 7:40 p.m., Deputy Inspector Maneri, using binoculars, observed an individual approach Rivera, who was standing in the vicinity of the Bronx intersection next to a red sedan.[2] *Id.* at ¶ 6(c); May 14, 2025 Tr. 87: 9–12. The individual handed Rivera what appeared to be U.S. currency. *Id.* at ¶ 6(c). Rivera then entered the front driver's side door of his vehicle, leaned over towards the passenger's side, and sorted through a bag. *Id.* Rivera then handed items to the individual. *Id.* The individual briefly observed the items and walked away. *Id.* The interaction between Rivera and the unidentified individual lasted approximately less than one minute. *Id.*

Deputy Inspector Maneri announced over his radio that he had observed a narcotics transaction and instructed the other officers to arrest Rivera, indicating that Rivera was located near a vehicle in the vicinity of the Bronx intersection. *Id.* at ¶ 6(d). Officers pulled up next to Rivera's vehicle at approximately 7:45 p.m. Doc. 27 at ¶ 9 (Rivera decl.). At this time, Rivera claims, the driver's side door of the vehicle was open, and he was on the sidewalk. *Id.* at ¶ 8. As some of the officers began questioning Rivera, Sergeant Lee Arroyo ("Sergeant Arroyo")[3] entered the vehicle through the driver's side. *Id.* at ¶ 10. Rivera stated that he did not give permission to enter the vehicle. *Id.* Sergeant Arroyo then went around to the passenger's side door, which he tried to open. *Id.* at ¶ 11. Finding that the passenger's side door was locked, Sergeant Arroyo asked for Rivera's keys. *Id.* Rivera refused, at which point the officers began handcuffing him. *Id.* Rivera then agreed to give the officers his keys. *Id.*

---

[1] In January 2024, Deputy Inspector Maneri held the rank of captain and was the commanding officer of the 52nd Precinct, which includes the Bronx intersection. May 14, 2025 Tr. 5:11–22. He was promoted to Deputy Inspector in April 2024. *Id.* at 5:24–6:1–4.

[2] Based on a search of motor vehicle records, Rivera is the owner of the vehicle. Doc. 1 at ¶ 6(k).

[3] In January 2024, Sergeant Arroyo was a sergeant in the 52nd precinct. May 14, 2025 Tr. 74:1–12. He has since transferred to the 46th precinct. *Id.*

With Rivera in handcuffs on the sidewalk, Sergeant Arroyo manually unlocked the passenger's side door of the vehicle. *Id.* at ¶ 12; *see also* May 14, 2025 Tr. 83:8-21. The body-worn camera footage shows Sergeant Arroyo opening and searching a closed backpack and the closed glove compartment. Doc. 25, Exhibit C at 19:48–50. Sergeant Arroyo then searched the back seat and reported over radio that he observed a firearm in the vehicle. Doc. 1 at ¶ 6(f). At that point, Deputy Inspector Maneri arrived at the scene, searched the vehicle, and found two firearms in the back pocket of the front passenger seat: a black 9mm Taurus semi-automatic pistol loaded with 11 rounds bearing a serial number and a blue-teal Derringer Cobra pistol loaded with two rounds bearing a defaced serial number. *Id.*

The officers transported Rivera to the 52nd precinct. *Id.* ¶ 6(g). At the precinct, the officers recovered approximately $74 in cash, 31 glassines of heroin, 12 bags of cocaine, and 13 vials of crack cocaine from Rivera's person. *Id.* at ¶ 6(g), (h). During arrest processing, Rivera reportedly told officers in substance and in part that with "two gun charges, crack, dope, and coke," he was "not getting released." *Id.* at ¶ 6(i). Thereafter, during an inventory search of the vehicle, officers recovered an additional six glassines of heroin. *Id.* at ¶ 6(j).

2. *Prior Felony Convictions*

On March 19, 2007, Rivera pleaded guilty in Bronx County Supreme Court to three felonies: (1) attempted robbery in the third degree, in violation of New York Penal Law § 160.05; (2) criminal possession of a loaded firearm in the third degree, in violation of New York Penal Law § 265.02(4); and (3) criminal possession of a controlled substance in the fifth degree, in violation of New York Penal Law § 220.06(5). *Id.* at ¶ 7(c). On April 19, 2007, Rivera was sentenced to a term of imprisonment of one year for those offenses. *Id.*

On May 29, 2012, Rivera pleaded guilty in Bronx Count Supreme Court to two felonies: (1) robbery in the third degree, in violation of New York Penal Law § 160.05;

3

and (2) escape from jail or custody in the second degree, in violation of New York Penal Law § 205.10(2). *Id.* at ¶ 7(b). On June 12, 2012, Rivera was sentenced to a term of imprisonment of two to four years for those offenses. *Id.*

On November 12, 2015, Rivera pleaded guilty in this District to one felony count of possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). *Id.* at ¶ 7(a). On March 10, 2016, Rivera was sentenced to a term of imprisonment of 51 months for that offense. *Id.*

### B. Procedural History

On April 3, 2024, Rivera was indicted and charged with three counts of distributing narcotics in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C), and 18 U.S.C. § 2; (2) using and carrying a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i); and (3) possessing a firearm after being convicted of a felony in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Doc. 12. On November 5, 2024, Rivera filed the instant motions to suppress and dismiss, Docs. 24, 26, and 25. Rivera filed a declaration in support of his motions on November 12, 2024. Doc. 27. On December 19, 2024, the Government filed its memorandum of law in opposition. Doc. 28.

On May 14, 2025, the Court held a hearing on the motion to suppress. Deputy Inspector Maneri and Sergeant Arroyo testified at the hearing, and the parties played video footage of the officers' body cameras and ARGUS surveillance cameras. For the reasons discussed below, Rivera's motion to suppress is DENIED.

## II. MOTION TO SUPPRESS

Rivera makes two arguments in support of his motion to suppress: (1) that his arrest was unlawful because it was not based on probable cause; and (2) that the subsequent warrantless search of his vehicle violated the Fourth Amendment. The Court considers each in turn.

### A. Arrest

Rivera argues that the officers lacked probable cause to arrest him on January 23, 2024. Doc. 26 at 8–10. Rivera thus asserts that the evidence obtained as a result of his arrest—including narcotics, guns, and his post-arrest statements—should be suppressed. *Id.* In response, the Government contends that the arrest was "well-supported" by "ample probable cause" based on the rooftop observations by Deputy Inspector Maneri. Doc. 28 at 13–15.

Where, as here, an arrest is conducted without a warrant, that arrest is consistent with the Fourth Amendment only if it is supported by probable cause. *Davis v. Gantt*, No. 18 Civ. 303 (PKC) (AYS), 2024 WL 4132372, at *3 (E.D.N.Y. Sept. 10, 2024) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)) ("a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). "Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 363–64 (2d Cir. 2011).

"Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal citations and quotation marks omitted). Indeed, a finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (citation omitted). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Boykin v. City of New York*, No. 22 Civ. 2675, 2023 WL 7383147, at *1 (2d Cir. Nov. 8, 2023) (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). "Probable cause is not a high bar."

5

*Wesby*, 583 U.S. at 57 (citation and quotation marks omitted).  If, however, a warrantless arrest is made without probable cause, evidence subsequently obtained because of that arrest can be excluded as "fruit of the poisonous tree[.]"[4]  *United States v. Serrano*, 695 F. App'x 20, 24 (2d Cir. 2017) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963)).

"To defeat a suppression motion, '[t]he Government bears the burden of proof as to establishing probable cause[.]'"  *United States v. Rodriguez-Genao*, No. 23 Cr. 261-03, 2025 WL 872996, at *4 (S.D.N.Y. Mar. 20, 2025) (quoting *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008)).  "The Government must make this showing 'by a preponderance of the evidence.'"  *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).

As applied here, these principles dictate that if the facts known to the officers who arrested Rivera would justify an objectively reasonable officer to believe Rivera had committed an offense, then the arrest was made with probable cause.  *See Wesby*, 583 U.S. at 57 (directing courts to "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.").  The Court finds that the Government has identified sufficient facts to draw this conclusion.

Specifically, the Government details how the arresting officers observed Rivera engage in suspicions activity in an area experiencing frequent violence and narcotics activity.  Doc. 28 at 12–15; *see* Doc. 1 at ¶ 6(a).  During this surveillance, Deputy Inspector Maneri observed with binoculars as an individual handed currency to Rivera.  *Id.* at ¶ 6(c).  Rivera then entered the vehicle, sorted through what appeared to be a bag,

---

[4] The exclusionary rule—requiring trial courts to exclude unlawfully obtained evidence in criminal trials—is the "principal judicial remedy to deter Fourth Amendment violations."  *United States v. McKenzie*, 13 F.4th 223, 231 n.5 (2d Cir. 2021) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016).  The exclusionary rule "encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and secondary evidence later discovered and found to be derivative of an illegality."  *Id.* (citation and internal quotation marks omitted).

6

and placed items in the individual's hand. *Id.* at ¶ 6(c). The individual observed the items briefly, and walked away. *Id.* at ¶ 6(c).

Faced with these facts, the arresting offers made an "entirely reasonable inference" that Rivera may have been involved in narcotics activity on the night of the arrest. *Wesby*, 583 U.S. at 57. "Courts in this Circuit have routinely found probable cause to arrest when the officer believes, based on his or her own observation and experience, that an individual was engaged in a hand-to-hand drug sale." *Daniels v. City of New York*, No. 15 Civ. 2251 (RJS), 2016 WL 4368378, at *4 (S.D.N.Y. Aug. 14, 2016) (cleaned up) (collecting cases). Here, this belief was bolstered by the observation of money changing hands. *Id.* (quoting *United States v. Nester*, No. 86 Cr. 1001 (KAR), 1987 WL 13184, at *5 (S.D.N.Y. June 24, 1987)) ("'the observation of currency in the course of a hand-to-hand transaction typical of [drug] sales acts as further support for a finding of probable cause'; indeed, '[c]ase law suggests that the observation of either drugs or money in a transaction which takes place under otherwise suspicious circumstances will justify an arrest'"). Furthermore, the area's recent history of narcotics activity weighs in favor of finding probable cause. *Cf. Tiramani v. Johnson*, 307 F. Supp. 3d 31, 37 (D. Conn. 2018) (quoting *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984)) ("The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely.").[5]

In his memorandum, Rivera attempts to dispute the extent to which the arresting officers were aware of the conduct detailed in the complaint. Doc. 26 at 9–10. Rivera contests that it is "implausible" that Deputy Inspector Maneri observed the individual handing Rivera currency. *Id.* Deputy Inspector Maneri was, after all, looking down at the Bronx intersection from a six-story high rooftop in the dark of night. *Id.* In his

---

[5] In this letter brief, Rivera argues that the Government's reliance on *Morales v. Greiner*, 381 F.3d 47, 47–48 (2d Cir. 2004) is misplaced, as he believes that *Morales* requires more particularized facts to support a finding of probable cause. Doc. 42 at 10–11. The Court does not find it necessary to rely on *Morales* and instead find that the area's recent history of narcotics activity supports a finding of probable cause.

subsequent letter brief, Rivera also attempts to question the reliability of Deputy Maneri's testimony by pointing out several alleged inconsistencies between his testimony and the surveillance video, including the direction from which the alleged buyer came from, Deputy's Maneri failure to mention the light-colored object in the alleged buyer's hand, and length of the interaction between Rivera and the alleged buyer. Doc. 42 at 2–7.

The Court, however, finds Deputy Inspector Maneri's testimony credible, accepts that, with binoculars, he could have seen the passing of currency, and does not find that the alleged inconsistencies Rivera pointed out are material to the finding of probable cause. In this regard, the Court notes that Government Exhibit 104, which was received in evidence and purports to show Deputy Inspector Maneri's vantage point from the roof of the building at nighttime, shows that the viewing conditions were clear, well lit, and unobstructed. It is thus reasonable that Deputy Inspector Maneri's testimony was credible, particularly if he used binoculars.

Rivera cites to *United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016) to argue that the facts articulated by the Government fail to establish probable cause. Doc. 26 at 10. In *McDow*, a court in this District granted a motion to suppress on the basis that an officer's testimony concerning his rooftop surveillance of the defendant was not credible. 206 F. Supp. 3d at 851. *McDow*, however, is inapposite because the testimony the officer gave in the suppression hearing conflicted materially with his testimony during an earlier state grand jury. *Id.* at 840 ("It became clear during the suppression hearing that [the arresting officer's] state grand jury testimony differed in important respects from his testimony at the hearing."). It is for this reason that the *McDow* court found the officer's testimony "unreliable[.]" *Id.* at 852. Here, on the other hand, the testimony offered by Deputy Inspector Maneri was consistent and credible.

In short, the circumstances preceding the arrest, in concert with "common-sense conclusions about human behavior," gave rise to a reasonable belief that Rivera had committed a crime. *Wesby*, 583 U.S. at 58; *see also United States v. Matos*, No. 17 Cr.

182 (KBF), 2017 WL 5989203, at *6 (S.D.N.Y. Dec. 4, 2017) (holding "defendant removing something from his jacket pocket and exchanging it for money at night, on the street, in an area known for drug transactions, gives rise to probable cause to arrest."); *United States v. Vasquez*, 297 F. Supp. 2d 696, 698 (S.D.N.Y. 2004) (finding probable cause where defendant observed handing an object from his car to another person in exchange for currency by "police officer conducting surveillance in a location known for drug sales"); *United States v. Washington*, No. 02 Cr. 1574 (LTS), 2003 WL 21250681 at *2–3 (S.D.N.Y. May 29, 2003) (finding probable cause where law enforcement officers observed a hand-to-hand transaction in a high-crime area).

Because Rivera's arrest was lawful, his fruit-of-the-poisonous-tree argument also fails. *Cf. United States v. Arias*, No. 18 Cr. 572 (JPO), 2019 WL 1274954, at *5 (S.D.N.Y. Mar. 20, 2019) ("because the Court has concluded that the *Terry* stop of [defendant's] vehicle was lawful under the Fourth Amendment, the Court need not consider [defendant's] fruit-of-the-poisonous-tree contentions further."). Accordingly, Rivera's motion to suppress all evidence obtained on the evening of January 23, 2024 is denied.

### B. Vehicle Search

Rivera separately contends that the search of his vehicle violated the Fourth Amendment, and that the contraband seized from the car should be excluded. Doc. 26 at 11–12. The Government argues that the search was justified by probable cause, and thus permissible under the automobile exception. Doc. 28 at 15–17.

The Fourth Amendment to the United States Constitution protects "persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Warrantless searches are ordinarily '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Harry*, 130 F.4th 342, 347 (2d Cir. 2025) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). One such exception is the automobile exception.

Under the automobile exception, "officers may conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or other evidence of a crime." *United States v. Wilson*, 699 F.3d 235, 245 (2d Cir. 2012). "If there is probable cause to believe a vehicle contains evidence of criminal activity," the automobile exception "authorizes a search of any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S. at 347.

The Court concludes that the same evidence that established probable cause to arrest also provided the arresting officers with probable cause to search Rivera's car. As relevant to this analysis, Deputy Inspector Maneri saw Rivera reach into his car and shuffle through a bag after receiving currency from an individual. Doc. 1 at ¶ 6(c). Rivera then placed items into the individual's hand in a manner which the officers considered indicative of narcotics trafficking. *Id.* Given these facts, the Court finds that a reasonable officer would have believed there to be a "a fair probability that contraband or evidence of a crime" would be found in Rivera's vehicle. *United States v. Bodnar*, 37 F.4th 833, 841 (2d Cir. 2022) (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)) ("Probable cause exists when the 'totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place.'").

Resisting the Government's assertion of probable cause, Rivera argues that the Officers lacked a reasonable belief that "evidence relevant to the crime of arrest might be found in the vehicle."[6] Doc. 26 at 12 (quoting *Gant*, 556 U.S. at 343). Rivera reiterates his contention that Deputy Inspector Maneri's observations were implausible because of his vantage point from a rooftop in the dark of night. *Id.*

Again, this argument fails to rebut probable cause. As discussed, the Court finds Deputy Inspector Maneri's testimony concerning his rooftop observations credible. From

---

[6] Rivera also argues that the vehicle search was not valid as a search incident to arrest because he was secured in handcuffs as it commenced. Doc. 26 at 11 (citing *Gant*, 556 U.S. at 339). Because the search was reasonable under the automobile exception, the Court does not reach the argument related to the search incident to arrest exception to the warrant requirement.

his vantage point with the use of binoculars, he could be expected to have viewed the passing of currency. *See* Doc. 1 at ¶ 6(c). And, given these observations, the officers could reasonably expect evidence of the alleged narcotics trafficking to be found in the vehicle. *See Gant*, 556 U.S. at 344 (distinguishing a traffic violation, for which police could *not* reasonably expect to find evidence in compartments of a defendant's vehicle, from a narcotics offense arrest, for which they could). The vehicle search was thus valid under the automobile exception to the warrant requirement and did not run afoul of the Fourth Amendment. Accordingly, Rivera's motion to suppress the evidence seized from the vehicle is denied.

### III. MOTION TO DISMISS

Rivera seeks the dismissal of Count Three, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to him.[7] Doc. 26 at 5. In response, the Government argues that: (1) as a felon, Rivera is not among "the people" entitled to Second Amendment protection; and (2) § 922(g)(1) is consistent with the Nation's tradition of firearm regulation. Doc. 28 at 25. Moreover, the Government contends that the violent nature of Rivera's prior felony convictions ensures that § 922(g)(1) is constitutional as applied here. *Id.*

As a preliminary matter, "[m]any other defendants have filed similar motions to dismiss in this District, and the Court is not aware of any instance in which such a motion has succeeded." *United States v. Ramos*, No. 23 Cr. 554 (MKV), 2024 WL 4979204, at *3 (S.D.N.Y. Dec. 4, 2024). As "every other Court in the District to consider the issue has previously explained, the Second Circuit has held that Section 922(g)(1) is constitutional, *see States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013), and that

---

[7] Federal Rule of Criminal Procedure 12(b)(1) permits a defendant to file pretrial motions raising "any defense, objection, or request that the court can determine without a trial on the merits." *See United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018). "A court may address a constitutional attack on an indictment within the context of a Rule 12(b) motion 'because an indictment's defects can affect a defendant's substantive rights at trial.'" *United States v. Dancy*, 744 F. Supp. 3d 165, 167 (D. Conn. 2024) (quoting *United States v. Smith*, 985 F. Supp. 2d 547, 561–62 (S.D.N.Y. 2014)

precedent remains binding on this Court after [*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022)]." *Ramos*, 2024 WL 4979204, at *3. Last year, the Supreme Court reiterated that "prohibitions . . . on the possession of firearms by 'felons and the mentally ill[ ]' are 'presumptively lawful.'" *United States v. Rahimi*, 602 U.S. 680, 699 (2024) (*District of Columbia v. Heller*, 554 U.S. 570, 626–27, n.26 (2008). Binding precedent in this Circuit thus compels denial of Rivera's motion to dismiss. *See United States v. Bell*, No. 24 Cr. 526 (PKC), 2025 WL 902730, at *2 (S.D.N.Y. Mar. 25, 2025) (collecting cases).

In any event, independent of *Bogle*, § 922(g)(1)'s prohibition on the possession of firearms by felons is constitutional both facially and as applied to Rivera.

### A. "The People" Entitled to Second Amendment Protection

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Court begins by considering whether Rivera is among "the people" whom the Second Amendment protects.

The Supreme Court has provided insight as to the scope of "the people" in the Second Amendment. In *Heller*, the Court started with a "strong presumption that the Second Amendment right . . . belongs to all Americans." 554 U.S. at 581. As the Supreme Court explained, "the People . . . unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580 (2008). The Supreme Court went on, however, to center its focus on the interests of "law-abiding, responsible citizens[.]". *Id.* at 635; *see also id.* at 644 (Stevens, J. dissenting) ("the Court itself reads the Second Amendment to protect a 'subset' significantly narrower than the class of persons protected by the First and Fourth Amendments; when it finally drills down on the substantive meaning of the Second Amendment, the Court limits the protected class to 'law-abiding, responsible citizens'"). Therefore, while the Second Amendment presumptively applies to all Americans, the Supreme Court has thus far limited its

12

scrutiny of firearm regulation to the rights of "law-abiding citizens."[8] *Id.*; *see also Bruen*, 597 U.S. at 29 (2022) (emphasis added) ("we do think that *Heller* and *McDonald* [*v. Chicago*, 561 U. S. 742 (2010)] point toward at least two metrics: how and why the regulations burden a *law-abiding citizen's right* to armed self-defense"); *Selim Zherka v. Pam Bondi*, 140 F.4th 68, 73 (2d Cir. 2025) (noting that the Supreme Court has never repudiated *Heller*'s assurance that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful.")

In this light, the Government argues that convicted felons like Rivera are not among "the People" entitled to Second Amendment rights. Doc. 28 at 25. The Court, however, is bound by the Supreme Court's determination that "the People . . . unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580 (2008); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 260 (1990) (holding that "the people" protected by the Second Amendment—much like "the people" protected by the First, Fourth, Ninth, and Tenth Amendments—"refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). The Government cites no binding precedent which disturbs this finding.

While the Government refers to articulations of the Second Amendment protecting the rights of "law-abiding citizens," this alone does not abrogate the simple, textual inclusion of felons among "the people." *See* Doc. 28 at 25–30. Indeed, as discussed above, *Heller* referred extensively to the rights of "law-abiding" citizens, while also clarifying that "the People" includes "all members of the political community, not an unspecified subset." 554 U.S. at 580 (2008). The Government's attempt to force a

---

[8] In *Rahimi*, the Supreme Court disclaimed the argument that an individual "may be disarmed simply because he is not 'responsible,'" because the term is unduly vague. 602 U.S. at 701. The Court did not explicitly disagree with the use of "law-abiding" as a basis for disarmament.

13

contradiction is unavailing; felons are among "the people," *and*, as discussed below, disarmament of felons is consistent with our nation's tradition of firearm regulation. This is because, as now-Justice Barrett has written, "all people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right." *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). The Supreme Court implicitly affirmed this approach in *Rahimi*, assuming that the defendant was among those protected by the Second Amendment even though he had committed violent acts. *See* 602 U.S. at 687 (analyzing whether the regulation fell within the Nation's tradition of firearm regulation, rather than finding as a preliminary matter that the defendant was not entitled to Second Amendment protection). Accordingly, "[t]here is no basis for reading 'the people' in the text of the Second Amendment to exclude felons." *United States v. Williams*, No. 23 Cr. 218 (VSB), 2023 WL 8355891, at *4 (S.D.N.Y. Dec. 1, 2023).

### B. The Nation's Historical Tradition of Firearm Regulation

The Supreme Court affirmed in *Bruen* that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 24, 33. For regulation of conduct that falls within the Second Amendment's text, the Government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The Supreme Court further elaborated in *Rahimi* that the appropriate analysis for courts to consider is "whether the challenged regulation is consistent with the principles that underpin [the nation's] regulatory tradition." 602 U.S. 680, 692 (2024).

Thus, for the § 922(g)(1) charge to stand, the Government must demonstrate "that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Government identifies as relevant analogues: (1) laws punishing felons and (2) laws disarming classes of individuals. Doc. 28 at 31–46.

The Government first refers to the principal penalties for a felony at the time of the founding: death and estate forfeiture.[9] Doc. 28 at 32; *see also Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, The Death Penalty: An American History 23 (2002)) (noting that capital punishment was "the standard penalty for all serious crimes."). As Blackstone explained, a felony at common law was "an offence which occasions a total forfeiture of either lands, or goods, or both . . . and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, Commentaries on the Laws of England, 95 (1769). During the First Congress, the framers made a number of felonies punishable by death, including piracy, robbery, counterfeiting, *see* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112–15 (1790), as well as forgery and horse theft, *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019). Since "the Founding generation understood that convicted felons could be subjected to the greater penalties of death or estate forfeiture," the Government reasons, "then they would also have viewed the lesser restriction of lifetime disarmament as permissible." Doc. 28 at 32.

The Court agrees that because the punishments historically imposed on felons went beyond disarmament, the lesser burden of § 922(g)(1) comports with the principles underlying the Nation's tradition. *See Medina*, 913 F.3d at 158 ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). Accordingly, the permanent disarmament of felons pursuant to § 922(g)(1) does not punish "to an extent beyond what was done at the founding." *See Rahimi*, 602 U.S. at 692.

---

[9] Both parties argue based on Founding-era conceptions of the Second Amendment. *See* Doc. 26 at 16 ("numerous courts have found a similiar [*sic*] absence of Founding Era precedent supporting a ban on firearms possession for felons."); Doc. 28 at 44 ("[§ 922(g)(1)] is 'relevantly similar' to restrictions from before the Founding to the present day"). The Court thus relies on the Founding-era understanding of the Second Amendment to define its scope.

The Supreme Court in Rahimi similarly reasoned that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that § 922(g)(8) imposes is also permissible." *Id.* at 699. Here, where capital punishment was permissible to respond to felonies, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible.

The Government also cites to laws categorically disarming certain classes of people. "During the colonial period, the American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy or dangerous." *Williams*, 2023 WL 8355891, at *4 (citing Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, 28–29 (2006)). Among these were laws disarming "slaves, freed blacks, Indians, and those of mixed-race ancestry[.]" *Id.* These categorical prohibitions were of course based on racism and would not be permissible today on other constitutional grounds. Nonetheless, this Court is bound by the Supreme Court's history-minded directives, and these laws demonstrate a historical tradition of categorically disarming certain groups based on legislative judgments that they "could not be trusted to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today." *Id.* at *5

Section 922(g)(1), which categorically disarms felons based on a legislative judgment as to safety, is thus "consistent with the principles that underpin [the nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. Rivera asserts, however, that this tradition is insufficiently similar to the permanent disarmament of felons as to render § 922(g)(1) constitutional. Doc. 26 at 17. In doing so, he apparently reads the Supreme Court's framework as requiring a historical twin to the challenged regulation. *See id.* (noting that "scholars have not been able to identify" a "founding-era" law permanently disarming all felons). But the Supreme Court rejected that narrow conception in *Rahimi*.

602 U.S. at 691–92 ("the Second Amendment permits more than just regulations identical to those existing in 1791.").

While the challenged law "must comport with the principles underlying the Second Amendment" the Supreme Court held that "it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 698 (quoting *Bruen*, 597 U.S. at 30). Requiring otherwise would result in "a law trapped in amber." *Id.* at 691. Moreover, demanding a historical twin would wrongly "assume[ ] that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* at 739–40 (Barrett, J., concurring).

Instead, *Rahimi* demands an analogue that is "relevantly similar" to the challenged regulation. *Id.* at 692. In *Rahimi*, the Supreme Court relied on Founding-era surety and going armed laws as historical examples. *Id.* at 698. These laws, as the *Rahimi* dissent protested, carried materially different ends and means compared to the challenged regulation in that case. *See id.* at 755 (Thomas, J., dissenting). The Supreme Court nonetheless concluded that "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). Here, the "historical record" provides sufficiently analogous precursors which "disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today." *Williams*, 2023 WL 8355891, at *5. Because our Nation's tradition of firearm regulation supports § 922(g)(1), the Court finds that it is constitutional on its face.

### C. Application of § 922(g)(1) to Rivera

Rivera further argues that § 922(g)(1) is unconstitutional as applied to him. Doc 26 at 22. As a preliminary matter, Rivera does not identify any binding authority to suggest that § 922(g)(1) is subject to as-applied challenges. As courts in this District have found, "there is no basis to draw distinctions under § 922(g)(1) based on the underlying felony conviction." *United States v. Ayala*, 740 F. Supp. 3d 314, 327

17

(S.D.N.Y. 2024) (quoting *United States v. Crawford*, No. 23 Cr. 566 (LGS), 2024 WL 1657879, at *5 (S.D.N.Y. Apr. 17, 2024).

Nonetheless, even if as-applied challenges based on the underlying felony conviction were permissible, § 922(g)(1) is constitutional as applied to Rivera. Rivera's prior felony convictions include robbery, narcotics offenses, and firearm possession. *See* Doc. 1 at ¶ 7(c). As Rivera himself acknowledges, he "has been convicted of at least [six] felonies that may be considered 'violent.'" Doc. 26 at 22. The Government points out that "[e]ven those courts that have questioned the application of Section 922(g)(1) to individuals with certain types of nonviolent convictions have nonetheless recognized that the statute is constitutional as applied to a defendant with the type of criminal history that the defendant has here." Doc. 28 at 49; *see United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) (even "assum[ing] for the sake of argument that there is some room for as-applied challenges" to Section 922(g)(1), the law is constitutional as applied to a defendant with prior violent felony convictions) (emphasis in original); *United States v. Williams* 113 F.4th 637, 661 (6th Cir. 2024) (holding that Section 922(g)(1) is constitutional as applied to defendant with prior violent felony convictions). Accordingly, to the extent the Second Amendment allows for an as-applied review concerning the underlying felony, Rivera falls squarely within the constitutionally-sound disarmament of those with violent felony convictions.

Rivera also asserts that "no judicial or other determination" adjudicated his level of threat and individually imposed his disarmament. Doc. 26 at 22. In doing so, he apparently misconstrues *Rahimi* as requiring an individual judicial determination for disarmament. While the Supreme Court in *Rahimi* held that an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment," it did not suggest that this was the *only* permissible means of disarmament. 602 U.S. at 702. Because the Court in *Rahimi* was considering § 922(g)(8), which involves an individual judicial determination, it had

no reason to explicitly consider the constitutionality of categorical disarmament based on a legislative determination that a particular class of individuals poses a threat. Even so, the Supreme Court was careful to specify that "prohibitions, like those on the possession of firearms by '*felons* and the mentally ill,' are 'presumptively lawful.'" *Rahimi*, 602 U.S. at 699 (emphasis added). In light of the Nation's tradition of similar categorical disarmament, the Court thus finds no reason to read an individual adjudication requirement into the Second Amendment. Accordingly, the Court rejects Rivera's as-applied challenge to § 922(g)(1), and denies his motion to dismiss Count Three.

### IV. CONCLUSION

For the reasons set forth above, Rivera's motion to suppress and his motion to dismiss Count Three are DENIED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 24.

It is SO ORDERED.

Dated: July 22, 2025
       New York, New York

EDGARDO RAMOS, U.S.D.J.